POMERANTZ LLP
Gustavo F. Bruckner
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KIMBERLY BELTRAN,<br>Individually and on Behalf of All<br>Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SOS LIMITED, YANDAI WANG,<br>and ERIC H. YAN,<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Kimberly Beltran ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SOS Limited ("SOS" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired SOS American depository shares ("ADSs") between July 22, 2020 and February 25, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC, against the Company and certain of its top officials.

2.     SOS is a technology company that purportedly provides marketing data, technology, and solutions for emergency rescue services. When the Company went public in April 2017, it was known as "China Rapid Finance Limited" and

claimed to focus on a peer-to-peer, micro-lending business. The Company later changed its name to "SOS Limited" in July 2020 and sold its peer-to-peer, micro-lending business in August 2020, rebranding itself into an emergency services business. In January 2021, the Company again shifted its business focus, this time to cryptocurrency mining.

3.     Critical to SOS's purportedly successful transition into a cryptocurrency mining business were the Company's claims to have entered into an agreement with HY International Group New York Inc. ("HY"), which calls itself the "world's largest mining machine matchmaker," to acquire 15,645 mining rigs—*i.e.*, personal computing machines built specifically for cryptocurrency mining—for $20 million, and the Company's plans to purchase FXK Technology Corporation ("FXK"), a purported Canadian cryptocurrency technology firm.

4.     In addition to rapidly changing its business focus, SOS has also rapidly changed the location of its headquarters. According to the Company's SEC filings, the address of the Company's principal executive offices has changed no less than five times since the Company went public in April 2017.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) SOS had misrepresented the true nature,

location, and/or existence of at least one of the principal executive offices listed in its SEC filings; (ii) HY and FXK were either undisclosed related parties and/or entities fabricated by the Company; (iii) the Company had misrepresented the type and/or existence of the mining rigs that it claimed to have purchased; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.   On February 26, 2021, Hindenburg Research ("Hindenburg") and Culper Research ("Culper") released commentary on SOS, claiming that the Company was an intricate "pump and dump" scheme that used fake addresses and doctored photos of crypto mining rigs to create an illusion of success. The analysts noted, for example, that SOS's SEC filings listed a hotel room as the Company's headquarters. The analysts also questioned whether SOS had actually purchased mining rigs that it claimed to own, as the entity from which SOS purportedly bought the mining rigs appeared to be a fake shell company. The analysts further alleged that the photos SOS had published of their purported "mining rigs" were phony. Culper noted that photographs of SOS's "miners" did not depict the A10 Pro machines that the Company claimed to own and instead appeared to show different devices altogether. Hindenburg, for its part, found that the original images from SOS's website actually belonged to another company.

7.     On this news, SOS's American depositary share ("ADS") price fell $1.27 per share, or 21.03%, to close at $4.77 per ADS on February 26, 2021.

8.     After the end of the Class Period, between February 27 and March 3, 2021, Hindenburg subsequently provided additional information on SOS that further supported its earlier allegations, including pictures, highlighting, *inter alia*, how SOS had allegedly taken steps to hide the misconduct noted in the February 26, 2021 corrective disclosures.

9.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and the subsequent damages took place in this Judicial District.  Pursuant to SOS's most recent annual report on Form 20-F, at the close of

December 31, 2019, there were 104,054,977 of the Company's Class A ordinary shares outstanding.  SOS's ADSs, each representing ten of the Company's Class A ordinary shares, trade on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors in SOS's ADSs located within the U.S., some of whom undoubtedly reside in this Judicial District.

13.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.    Plaintiff, as set forth in the attached Certification, acquired SOS securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.    Defendant SOS is a Cayman Islands corporation with its current principal executive offices located at Building 6, East Seaview Park, 298 Haijing Road, Yinzhu Street, West Coast New District, Qingdao City, Shandong Province 266400, People's Republic of China ("China").  The Company's ADSs trade in an efficient market on the NYSE under the ticker symbol "SOS."

16.    Defendant Yandai Wang ("Wang") has served as SOS's Executive Chairman and Chief Executive Officer at all relevant times.

17.     Defendant Dr. Eric H. Yan ("Yan") was hired by SOS on January 6, 2021, and was appointed the Company's Vice President of Operation on January 13, 2021.  Currently, Yan serves as Vice President of SOS Information Technology Co., Ltd., the Company's operating subsidiary through which the Company engages in its cryptocurrency-related business.  Yan is primarily responsible for the Company's cryptocurrency operations.

18.     Defendants Wang and Yan are sometimes referred to herein as the "Individual Defendants."

19.     The Individual Defendants possessed the power and authority to control the contents of SOS's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of SOS's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with SOS, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.     SOS and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     SOS is a technology company that purportedly provides marketing data, technology, and solutions for emergency rescue services.  When the Company went public in April 2017, it was known as "China Rapid Finance Limited," which claimed to focus on a peer-to-peer, micro-lending business.  The Company later changed its name to "SOS Limited" in July 2020, and sold its peer-to-peer, micro-lending business in August 2020, rebranding itself into an emergency services business.  In January 2021, the Company again shifted its business focus, this time to cryptocurrency mining.

22.     Critical to SOS's purportedly successful transition into a cryptocurrency mining business were the Company's claims to have entered into an agreement with HY, which calls itself the "world's largest mining machine matchmaker," to acquire 15,645 mining rigs for $20 million, and the Company's plans to purchase FXK, a purported Canadian cryptocurrency technology firm.

23.     In addition to rapidly changing its business focus, SOS has also rapidly changed the location of its headquarters.  According to the Company's SEC filings, the address of the Company's principal executive offices has changed no less than

five times since the Company went public in April 2017.  Specifically, the Company's first listed address for its principal executive offices with the SEC was at 5th Floor, Building D, BenQ Plaza, 207 Songhong Road, Changning District, Shanghai 200335, China.  Before the end of June 2019, the Company had changed the address of its principal executive offices yet again, to "2th" Floor, Building D, BenQ Plaza, 207 Songhong Road, Changning District, Shanghai 200335, China.  By the end of April 2020, the Company's principal executive offices were listed at Room 7-705, Zhongjidasha Plaza, 819-1 Yinxianglu Road, Nanxiang Township, Jiading District, Shanghai, 201802, China.  By the end of July 2020, the Company's principal executive offices were listed at Room 8888, Jiudingfeng Building, 888 Changbaishan Road, Qingdao Area, China (Shandong) Pilot Free Trade Zone, China. Finally, as recently as March 2021, the Company's principal executive offices have changed yet again to Building 6, East Seaview Park, 298 Haijing Road, Yinzhu Street, West Coast New District, Qingdao City, Shandong Province 266400, China.

**Materially False and Misleading Statements Issued During the Class Period**

24.    The Class Period begins on July 22, 2020.  On July 21, 2020, post-market, SOS filed a report of foreign private issuer on Form 6-K with the SEC, signed by Defendant Wang.  This Form 6-K was the Company's first filing with the SEC that listed the Company's "[a]ddress of principal executive office" as Room

9

8888, Jiudingfeng Building, 888 Changbaishan Road, Qingdao Area, China (Shandong) Pilot Free Trade Zone, China.  As Hindenburg would later find, this address was actually a hotel room in China.  Not long after Hindenburg connected the address to a Chinese hotel room, the Company changed its principal executive office address to its currently listed address in a March 3, 2021 filing with the SEC—*i.e.*, within three business days after Hindenburg published its findings.

25.     On January 6, 2021, SOS issued a press release announcing that it had hired "Renowned Cryptocurrencies Security Expert" Defendant Yan.  That press release touted that Defendant Yan is an "expert in the blockchain security for cryptocurrency and digital assets in China," and, prior to SOS, "founded Shenzhen eSecureChain Technologies Inc which offered various lines of products and services" for cryptocurrency and crypto mining.  According to that press release, Yan would "utilize his cryptocurrency mining, protection, insurance expertise and his industry resources to lead SOS's efforts to set up a new business to apply blockchain-based security and insurance technologies in the safeguard of cryptocurrencies and digital assets, and strategically upgrade SOS's existing portfolios of products and services."

26.     That same press release quoted Defendant Wang, who touted, among other things, that Defendant "Yan's technologies have revolutionized the way to protect our digital assets and cryptocurrencies from being attacked and lost," and

that "SOS plans to launch the first digital assets insurance company and the first cryptocurrency bank in the world, backed up by [Defendant] Yan's technologies," calling the venture "urgent" and "highly necessary" for the Company's cryptocurrency operations.

27.    On January 13, 2021, SOS issued a press release announcing its "crypto mining plan," including heavy investments "in the crypto mining business to take advantage of the growing investors' realization of the values and potentials of the crypto assets."  According to that press release, Defendant Yan, now the Company's Vice President of Operation, who was tasked with the Company's "cryptocurrencies security and insurance operation," would "also be responsible for the crypto mining business" and "lead a team to come up with a detailed plan of setting up a series of cloud crypto mining sites in the regions where energy costs are much lower and clean energy resources much more."  That press release also asserted that "SOS anticipates focusing on the mining of the key mainstream cryptocurrencies, such as BTC, etc."; that, if successfully developed, the Company would "expand mining further to the full coverage of all of mainstream cryptocurrencies"; and that SOS would "provide a variety of cloud based crypto mining services, such as SOS self-mining, miner trusteeship, cryptocurrency-related DeFi [decentralized finance], security and insurance services for cryptocurrencies, etc."

28.   That same press release also quoted Defendant Wang, who represented that Defendants "expect that SOS's planned cloud based crypto mining and crypto currency security and insurance operation spearheaded by [Defendant] Yan, will become one of key growth drive of SOS."

29.   On January 19, 2021, SOS issued a press release announcing that it had entered into a non-binding letter of intent ("LOI") to acquire FXK, a purported "Canadian-based company, specializing in the blockchain technology consulting and operations and support for cryptocurrency exchanges and cloud crypto algorithmic power exchanges, to further extend SOS ecosystem of blockchain and cryptocurrencies, as well as to expand its operations to North America."

30.   That press release represented, among other things, that SOS and FXK were distinct entities engaged in the cryptocurrency market, the combination of which would enhance the Company's overall cryptocurrency operations:

> FXK is a licensed crypto technology provider in Canada. Its current services and products include the design, construction, operations and support of exchange platforms of cryptocurrencies and cloud crypto algorithmic power, and blockchain-based solutions.
>
> SOS is an emerging blockchain-based and big data-driven marketing and service provider, with a nationwide membership base of approximately 20 million in China. Recently, SOS has outlined its strategy in blockchain and cryptocurrencies, which include a series of initiatives to expand its business into cryptocurrency mining as well as cryptocurrency security and insurance. The core infrastructure of SOS rescue, insurance marketing and service supply chain is built on big date [*sic*], blockchain-based technology, cloud computing, AI, satellite, and 5G network, etc.

Pursuant to the [LOI], SOS is expected to acquire 100% of the outstanding shares of FXK for a combination of Class A ordinary shares and cash. The Company's planned acquisition of FXK is aimed to further expand and upgrade its ecosystem of cryptocurrencies and digital assets as well as to expand its business to North America.  As the transaction proceeds, the Company will publicly disclose required information either through press releases or SEC filings, as appropriate.

31.    To further give investors the impression that SOS and FXK were unrelated entities engaged in arms-length negotiations, the same press release stated, in relevant part, that "[c]ompletion of the transaction is subject to due diligence investigations by the relevant parties, the negotiation and execution of a definitive share exchange agreement, satisfaction of the conditions negotiated therein including the approval of the Company's Board of Directors . . . and the satisfaction of other customary closing conditions."

32.    Moreover, the same press release quoted the Individual Defendants, who similarly touted the potential acquisition of FXK.  Specifically, Defendant Yan touted that "with its leading-edge technologies in cryptocurrency exchanges, and crypto algorithmic power exchanges, acquisition of FXK will further expand our ecosystem of cryptocurrencies and cloud crypto mining and security and insurance"; and Defendant Wang asserted that "FXK is a leader in cryptocurrency and crypto algorithmic power exchange technologies," the acquisition of which would expand the Company's operations "to North America as well as expedite the executions of

our strategy in cryptocurrencies and cloud crypto mining and security and insurance."

33.     On January 21, 2021, SOS issued a press release announcing that it had entered into a purchase agreement with HY to supply the Company with mining rigs. Specifically, that press release represented that, under the agreement, SOS would "procure 14238 BTC mining rigs with BTC Hash Power of approximately 527P, as well as 1408 ETH mining rigs with Hash Power of approximately 1056G as part of SOS' plan to execute its strategic plan of cloud cryptocurrency mining in pursuit of the rising cryptocurrency prices"; that the Company would "pay approximately US$20 million to purchase 14238 PCS built with parts including the Momentum T2T 37T Double Speed, 1408 Momentum A10 Pro 780M, from HY . . . a seller of cryptocurrency mining rigs"; that "the pool of harsh power [from these machines] is projected to create roughly 3.5 BTC and 63 ETH every day, making about $206,551USD per day, based on the current cryptocurrency prices"; and that "[t]he shipment is expected to be delivered over three time installments: (1) February 14, 2021, 5000 PCS; (2) March 14, 2021, 5000 PCS; and (3) April 15, 2021, 5646 PCS."

34.     On February 9, 2021, SOS issued a press release announcing that it had "received 5000 PCS of mining rigs ahead of schedule on Feb. 9, 2021, five days earlier than the delivery date set by the purchase agreement with the seller," HY.

That press release touted, in relevant part, that "[t]he first batch of delivery is composed of a pool of 5000 PCS of mining rigs, which can generate about BTC Hash Power 175P and ETH Hash Power 350G"; that "the annual ROI (return on investment) is projected to be significant based on the current crypto price momentum" if the machines operate as expected; and that HY "also confirmed that they have enough inventories of crypto mining rigs and that they can fulfill the next two batches of shipments as scheduled."

35.     The same press release also quoted Defendant Wang, who touted that Defendants "have secured supply of crypto mining equipment that is expected to generate sufficient crypto hash power to allow us to promptly capture the rising cryptocurrency price."

36.     On February 23, 2021, SOS issued a press release announcing "that the 5000 PCS of crypto mining rigs, which were the first batch of delivery received on February 9, 2021, have gone live today"; that "[t]his batch of 5000 PCS of mining rigs can generate about BTC Hash Power 175P"; and that, if operating as expected, "the annual ROI (return on investment) is projected to be significant based on the current crypto price momentum."  That press release also included a photo of the purportedly purchased mining rigs on a metal display rack.  Attached to the rack was a piece of paper with the word "SOS" on it.  As Culper would later point out, the machines displayed in the photo did not match the design, shape, or branding of the

mining rigs that SOS stated it had purchased from HY, casting doubt on whether the machines were ever actually purchased.

37.    Additionally, that press release quoted Defendant Wang, who represented that "[a]s institutional investors are also jumping on the bandwagon of cryptocurrencies like BTC, we expect the price momentum of crypto currencies like BTC and ETH will increase further and we will do our best to capture this opportunity by creating more cloud crypto mining pools in the near term."

38.    On February 24, 2021, SOS issued another press release announcing "the receipt of the second batch of 5000 PCS of crypto mining rigs."  That press release represented that "[o]n the same date the second batch of 5000 PCS of mining rigs are received, SOS team kicked off the configurations and installations which are expected to be completed very soon"; that "[o]nce this batch of mining rigs go live, we expect the pool of 5000 PCS will be able to generate about BTC Hash Power 175P and ETH Hash Power 350G"; and that, "[i]f the machine operates as expected, the long-term ROI (return on investment) is projected to be promising, despite of recent pullbacks of cryptocurrency prices."

39.    Additionally, that press release quoted Defendant Wang, who touted that, "although the cryptocurrency prices, such as BTC prices, might continue to fluctuate, we believe the big general trend for & cycle of cryptocurrencies are still upward," and that, "[a]s institutional investors have been becoming one significant

driving force behind cryptocurrencies," including "BTC and ETH, which will be utilized as a hedge against ongoing quantitative easing by sovereign currencies, therefore, we remain committed to be very confident about our long-term strategic investment in crypto currencies operation."

40.   The statements referenced in ¶¶ 24-39 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) SOS had misrepresented the true nature, location, and/or existence of at least one of its principal executive offices listed in its SEC filings; (ii) HY and FXK were either undisclosed related parties and/or entities fabricated by the Company; (iii) the Company had misrepresented the type and/or existence of the mining rigs that it claimed to have purchased; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

41.   On February 26, 2021, Hindenburg and Culper released commentary on SOS, claiming that the Company was an intricate "pump and dump" scheme that used fake addresses and doctored photos of crypto mining rigs to create an illusion of success.   Hindenburg, for its part, published over twenty posts on Twitter,

including pictures, indicating that SOS's headquarters, cryptocurrency expert, and relationships with HY and FXK were all a sham.  For example, with respect to SOS's headquarters, Hindenburg noted that it "visited the address listed in the company's SEC filings"—namely, the address at Room 8888, Jiudingfeng Building, 888 Changbaishan Road, Qingdao Area, China (Shandong) Pilot Free Trade Zone, China—"and found it was a hotel," at which "[a] woman who worked for the hotel told [Hindenburg] there were 'no companies here.'"

42.    Hindenburg also alleged that SOS's press release announcing the Company's hiring of "Renowned Cryptocurrencies Security Expert" Yan "appeared to include fabrications related to Yan's background."   Specifically, Hindenburg noted that while SOS "claims Yan was the founder of Shenzhen eSecureChain Technologies," Hindenburg had found that "the eSecureChain website uses the exact same '/sosbox' theme that SOS's website uses" and that "the eSecurechain website was set up just two days prior to []SOS announcing Yan joining the team."

43.    With respect to HY, Hindenburg found that the entity "was formed mid last year, and is registered to the same exact address as an []SOS subsidiary," and that "HY claims to have a China office" that Hindenburg "visited and found the office doesn't exist."

44.    With respect to FXK, Hindenburg alleged that the entity "looks to be an undisclosed related party shell," citing how FXK's "website uses photos that

appear to have been stolen from a separate and legitimate Chinese crypto mining company called RHY" and "only has one news item, announcing the SOS deal"; that Hindenburg "could find no real office for FXK, no employees on LinkedIn, no glassdoor reviews, no customer reviews, no social media presence or news articles (other than press releases about the []SOS announcement)"; that FXK's website, like eSecureChain, uses the same specific website theme SOS "uses . . . for its website labeled Sosbx in its website's source code," which "indicat[ed] both sites were set up by SOS," in addition to "[]SOS's fonts and headers match[ing] with FXK's website"; that "[t]he FXK deal was announced on January 19th," and yet "web crawler WayBackMachine shows no evidence that the site existed prior to February 17th, almost a month later," and "[t]he most recent web capture prior to February 17th was a Chinese page saying that the domain was for sale, in May 2019"; and that "FXK included multiple pictures of their supposed mining center on their website," but "[a] reverse image search of those pictures reveals the mining operation is not FXK's, instead the pictures are lifted off a legitimate Chinese mining company called RHY," and Hindenburg's "investigator contacted RHY and was told that FXY was fake and copying their website."

45.     Culper, on the other hand, published a report on SOS entitled "SOS Ltd (SOS): Nothing to Save Here," which largely substantiated and added to the allegations in the Hindenburg Twitter posts.  For example, with respect to HY, the

Culper report alleged that the entity "resembles a shell company which SOS has either created itself or co-opted into its fraud," citing how "HY's State of New York business documents list an address at a virtual office in New York City" that is "shared by SOS and its lawyers, as indicated by its most recent S-3 filing"; that "HY's website is hosted on the same server and shares an IP [Internet Protocol[1]] address with FXK . . . HY's intended acquisition target, as well as with an SOS executive's former company"; that "HY's website claims its CEO is 'Claire Low,'" but Culper was "unable to find any outside references to this name that confirm this person's existence"; that "HY listed zero principal officers on its State of New York documents, effectively concealing its true provenance"; and that "HY's contact information displays a sole Gmail address," even though, "[p]resumably, a mining supplier with the capability to fill a $20 million order at a far faster rate than its peers would have its own company email address."

46.    Additionally, the Culper report alleged that SOS had misrepresented the mining rigs it had purportedly purchased from HY, stating that "SOS's own photo displays not A10 Pro or T2T 37T miners, but Avalon A1066 miners, suggesting that the miners pictured do not belong to SOS," which was "unsurprising, given that the 'A10 Pro 780M' miner that SOS has claimed is now 'live' is still not

---

[1] An "Internet Protocol," or IP, address is a type of unique identifier that allows devices to connect to the Internet.

yet even available for delivery from the manufacturer." In coming to this conclusion, the Culper report compared SOS's photo of the mining rigs it had purportedly purchased from HY with those on the market, finding various inconsistencies with the branding, shape, and design of both the units and their power supplies. As the Culper report noted, "SOS claimed to purchase and install 'Momentum' brand A10 Pro 780M and T2T 37T miners, yet the very few miners the Company was willing to picture appear to be totally different, calling into question whether they truly belong to SOS."

47.     The Culper report also questioned SOS's purported dealings with, and the existence of, FXK, noting that "FXK's only listed address is a 5-bedroom home in British Columbia, an apparent 'rent-an-office' space shared by at least 4 other entities"; that "FXK's website also appears to be a sloppy rip-off of RHY, a well-known Chinese crypto operator," and "even appears to have accidentally left RHY behind in its copied webpages"; that "FXK's source code contains numerous references to 'sosbx', or SOS's insurance business, hence suggesting its very origin ties directly to the Company"; and that "FXK shares a common ICP [Internet Content Provider[2]] number with SOS, again suggesting common ownership."

---

[2] An "Internet Content Provider," or ICP, number is a type of mandatory and unique identifier issued by the Chinese government to host a public website or serve content from a mainland Chinese server that appears on a website's homepage. The same ICP number can be used by multiple websites owned by the same company.

48.    Following the release of the Hindenburg Twitter posts and Culper report, SOS's ADS price fell $1.27 per share, or 21.03%, to close at $4.77 per ADS on February 26, 2021.

49.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Post-Class Period Disclosures**

50.    Between February 27 and March 3, 2021, Hindenburg documented additional information on SOS, including pictures, highlighting, *inter alia*, how SOS had allegedly taken steps to hide the misconduct noted in the February 26, 2021 corrective disclosures.  Specifically, Hindenburg noted that "[i]t appears []SOS is actively attempting to remove digital traces of its suspect deals"; that "[a]cquisition target FXK's website has been intermittently down," even though "[i]t purports to be a Canadian company but is displaying [an] error message in Mandarin"; that eSecureChain's website "recently used the same ICP as []SOS, but it was removed," although "[t]he prior source code is still available via Google cache," for which Hindenburg provided "[b]efore and after pictures [to] show the removal"; that after Hindenburg "pointed out that []SOS's supposed Canadian acquisition target FXK seemed to have its website set up by []SOS and hosted on the same []SOS server, the company moved its server from Hong Kong to California and updated its source

code to remove references to SOS"; that HY similarly "also ported over its server, masking the relationship with []SOS"; and that "[f]ollowing [Hindenburg's] work showing that []SOS's claimed HQ address didn't match the HQ in its press release, the company posted the [current] address for the first time," after which Hindenburg visited the location, "found it was a match," "examined the building and see why the address wasn't listed in the first place," and, including a picture, showed that "[]SOS has the ground floor, as can be seen by the SoS logo on the windows, but it appeared completely empty" with "no people or signs of activity on the floor."

51.     Hindenburg also published a link on Twitter showing that "RHY posted an official statement corroborating [Hindenburg's] work and Culper's work, accusing FXK of blatantly stealing its website."

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

52.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired SOS ADSs during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, SOS ADSs were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by SOS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

54.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SOS;

- whether the Individual Defendants caused SOS to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of SOS ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

57.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

58.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- SOS ADSs are traded in an efficient market;

25

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and

- Plaintiff and members of the Class purchased, acquired and/or sold SOS ADSs between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

59.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

60.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

61.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

63.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of SOS ADSs; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire SOS ADSs at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

64.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other

statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for SOS ADSs. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about SOS's finances and business prospects.

65.     By virtue of their positions at SOS, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

66.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of SOS, the Individual Defendants had knowledge of the details of SOS's internal affairs.

67.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of SOS.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SOS's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of SOS ADSs was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning SOS's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired SOS ADSs at artificially inflated prices and relied upon the price of the ADSs, the integrity of the market for the ADSs and/or upon statements disseminated by Defendants, and were damaged thereby.

68.    During the Class Period, SOS ADSs were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of SOS ADSs at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of

the Class known the truth, they would not have purchased or otherwise acquired said ADSs, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of SOS ADSs was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of SOS ADSs declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

69.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's ADSs during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

71.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

72.     During the Class Period, the Individual Defendants participated in the operation and management of SOS, and conducted and participated, directly and indirectly, in the conduct of SOS's business affairs.   Because of their senior positions, they knew the adverse non-public information about SOS's misstatement of income and expenses and false financial statements.

73.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SOS's financial condition and results of operations, and to correct promptly any public statements issued by SOS which had become materially false or misleading.

74.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SOS disseminated in the marketplace during the Class Period concerning SOS's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause SOS to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of SOS within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SOS ADSs.

75.     Each of the Individual Defendants, therefore, acted as a controlling person of SOS.  By reason of their senior management positions and/or being directors of SOS, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, SOS to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of SOS and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

76.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by SOS.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated:  March 30, 2021                    Respectfully submitted,

POMERANTZ LLP

*/s/ Gustavo F. Bruckner*
Gustavo F. Bruckner
Jeremy A. Lieberman*
J. Alexander Hood II*
James M. LoPiano*
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom*
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

(**pro hac vice* applications forthcoming)

*Attorneys for Plaintiff*